**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19–1383**

FELICIA HARKNESS DEAN, as Guardian and Conservator for and on behalf of
Janel Harkness, an incapacitated adult,

Plaintiff – Appellee,

v.

STEPHEN B. MCKINNEY,

Defendant – Appellant,

and

CHAD MCBRIDE, in his official capacity as the Sheriff of Anderson County
Sheriff's Office; THE ANDERSON COUNTY SHERIFF'S OFFICE,

Defendants.

Appeal from the United States District Court for the District of South Carolina, at
Anderson.  Timothy M. Cain, District Judge.  (8:17–cv–02088–TMC)

Argued:  January 31, 2020                    Decided:  October 2, 2020

Before GREGORY, Chief Judge, MOTZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Motz
joined.  Judge Richardson wrote a dissenting opinion.

**ARGUED:** James William Logan, Jr., LOGAN & JOLLY, LLP, Anderson, South Carolina, for Appellant. Jordan Christopher Calloway, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellee. **ON BRIEF:** Stacey Todd Coffee, LOGAN & JOLLY, LLP, Anderson, South Carolina, for Appellant. Robert V. Phillips, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellee.

GREGORY, Chief Judge:

This civil action arises out of claims for injuries suffered in an automobile collision. Stephen B. McKinney appeals the district court's denial of his motion for summary judgment based on qualified immunity. For the reasons stated below, we affirm the decision of the district court.

I.

On October 19, 2016, Anderson County, South Carolina Deputy Sheriff Stephen B. "Brent" McKinney was on patrol in his government-owned SUV. At approximately 10:30 p.m., fellow Deputy Sheriff Kenneth Lollis radioed a request for assistance with a traffic stop. Believing that Lollis's voice sounded as if he was "shaken," J.A. 149, Shift Supervisor Lieutenant Scott Hamby issued a "Code 3" for available officers to assist Lollis. Per Sheriff's Office policy governing "Emergency Vehicle Operations" and state law,[1] a

---

[1] South Carolina Code § 56-5-760 provides in part: (A) The driver of an authorized emergency vehicle, *when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law* or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions of this section.

(B) The driver of an authorized emergency vehicle may . . . (3) *exceed the maximum speed limit if he does not endanger life or property* . . . .

(C) The exemptions in this section granted to an authorized emergency vehicle apply only when the vehicle is making use of an audible signal . . . and visual signals . . . , except that an authorized emergency vehicle operated as a police vehicle need not use an audible signal nor display a visual signal when the vehicle is being used to: (1) obtain evidence of a speeding violation; (2) respond to a suspected crime in progress when use of an audible or visual signal, or both, could reasonably result in the destruction of evidence (Continued)

3

"Code 3" represents an "emergency response" where "human life or safety is threatened." J.A. 75. A Code 3 is the only time officers are permitted to exceed posted speed limits or otherwise disregard traffic regulations. *See* S.C. Code Ann. § 56-5-760. Other than with respect to certain exemptions described in Section 56-5-760(C)—none of which apply here—officers are required to use emergency lights and sirens for every Code 3 response. *See* S.C. Code Ann. §§ 56-5-4700; 56-5-4970.[2]

McKinney activated his emergency lights and siren and proceeded to Lollis' location. "[A] few seconds" later, Lollis radioed that units could "back down on emergency response but continue to him 'priority.'" J.A. 149. Hamby cancelled the Code 3 but advised responding officers to continue to Lollis's location. McKinney acknowledged Hamby's cancellation of the Code 3 and "cut back to normal run," J.A. 43, a non-emergency response where officers must abide by all traffic laws. J.A. 75, *see* S.C. Ann. §§ 56-5-760. McKinney deactivated his emergency lights and siren, and, according

---

or escape of a suspect; or (3) surveil another vehicle or its occupants who are suspected of involvement in a crime.

(D) The provisions of this section do not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons.

S.C. Code Ann. § 56-5-760(A)-(D) (emphasis added).

[2] *See also* S.C. Code Ann. § 56-5-4970 ("Any authorized emergency vehicle may be equipped with a siren, whistle or bell capable of emitting sound audible under normal conditions from a distance of not less than five hundred feet . . . but such siren shall not be used except when such vehicle is operated in response to an emergency call or in the immediate pursuit of an actual or suspected violator of the law, in which latter event the driver of such vehicle shall sound such siren when necessary to warn pedestrians and other drivers of the approach thereof.").

to McKinney, "began to reduce the speed of [his] vehicle." J.A. 40. As he continued along the road to assist Lollis, McKinney passed Hamby, who was travelling in the opposite direction. Approximately two minutes after Hamby cancelled the Code 3, McKinney lost control of his vehicle on a curved and unlit section of the road. He crossed the center line and struck Janel Harkness's sedan nearly head-on. Harkness sustained extensive and severe orthopedic and neurological injuries. An accident reconstruction determined that McKinney was travelling at least 83 miles per hour when he began to skid around the curve—at least 38 miles per hour over the 45 mile-per-hour speed limit.[3] The Traffic Collision Report indicates, and McKinney does not contest, that he "contributed to [the] collision" and was "driving too fast for conditions." J.A. 68.

As a sheriff's deputy, McKinney received training on the operation of a police vehicle, including when department policy and state law required him to use his emergency lights and siren, and when and under what circumstances he could exceed the speed limit. His training also included instruction on the risks of night driving. The rules regarding safe vehicle operations were reinforced during remedial counseling McKinney received following his involvement in a series of incidents involving his operation of police vehicles.

---

[3] Hamby's incident report notes that he did not observe McKinney "traveling faster than the posted speed limit." J.A. 43. But the district court inferred that McKinney proceeded to Lollis's location at a speed "well in excess of the posted speed limit" based on (1) McKinney's affidavit that he had to decrease his speed after the Code 3 was cancelled, and (2) the accident reconstructionist's conclusion that he was traveling at approximately 83 miles per hour at the time of impact. J.A 160-61.

Harkness's mother, Felicia Harkness Dean (the "plaintiff"), acting as Harkness's Guardian and Conservator, filed a civil action in state court against McKinney, Anderson County Sheriff Chad McBride, and the Anderson County Sheriff's Office. The complaint included a claim pursuant 42 U.S.C. § 1983 alleging that McKinney violated Harkness's substantive due process rights under the Fourteenth Amendment by "driving his vehicle at such an extreme rate of speed without responding to an emergency [or] chasing a criminal suspect," exhibiting "conscience-shocking deliberate indifference" to Harkness's life and safety. J.A. 13. The complaint also included a claim asserting negligence and gross negligence under the South Carolina Tort Claims Act. S.C. Code Ann. § 15-78-10, *et seq.*[4]

McKinney removed the case to federal court, and thereafter moved for summary judgment, asserting that he was entitled to qualified immunity as to the plaintiff's Fourteenth Amendment claim because the plaintiff failed to establish a violation of Harkness's substantive due process right. The district court denied McKinney's motion, finding that (1) a reasonable jury could conclude that McKinney violated her substantive due process right; (2) McKinney is not entitled to qualified immunity; and (3) the *Parratt-Hudson* doctrine does not preclude her § 1983 action.

We affirm the decision of the district court. We find that McKinney was not entitled to summary judgment based on qualified immunity. A reasonable jury could conclude that McKinney violated Harkness's clearly established substantive due process right. Further, the *Parratt-Hudson* doctrine does not bar the plaintiff's substantive due process claim.

---

[4] These claims are not at issue in this appeal.

II.

A.

A district court's denial of summary judgment based on qualified immunity is reviewed *de novo*. *Iko v. Shreve*, 535 F.3d 225, 237 (4th Cir. 2008) (citing *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007)). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019) (citing *Iko*, 535 F.3d at 234) (a court, when viewing facts in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor, must determine whether defendant is entitled to qualified immunity); *Brown v. Elliott*, 876 F.3d 637, 641–42 (4th Cir. 2017) ("[W]hen resolving the issue of qualified immunity at summary judgment, a court must ascertain the circumstances of the case by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor.") (internal quotation marks omitted).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In considering a qualified immunity defense, the court must consider whether the official violated a statutory or constitutional right, and if so, whether that right was clearly established at the time of the alleged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Miller v. Prince George's Cty.*, 475 F.3d 621, 627-28 (4th Cir. 2007).

7

McKinney argues on appeal that he is entitled to qualified immunity because his actions in driving his vehicle did not rise to the level of a Fourteenth Amendment substantive due process violation that was clearly established at the time of the collision. We examine each prong of qualified immunity analysis in turn.

B.

1.

First, McKenney asserts that the district court erred in finding that there was sufficient evidence of a constitutional violation. To establish a substantive due process violation, the plaintiff must show that McKinney's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). The parties agree that this "shocks the conscience" standard applies to § 1983 claims alleging a violation of substantive due process based on alleged police misconduct. *See Temkin v. Frederick Cty. Commissioners*, 945 F.2d 716, 722 (4th Cir. 1991). As a threshold matter then, we must first determine what level of culpability is required for McKinney's actions to be considered "conscience shocking." *Lewis*, 523 U.S. at 850.

The Supreme Court in *Lewis* described a "culpability spectrum" along which behavior may support a substantive due process claim. *Id.* at 848-49. The Court rejected "customary tort liability as any mark of sufficiently shocking conduct" and held that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* At the other the end of the spectrum, the Court explains,

8

is behavior "that would most probably support a substantive due process claim; conduct intended to injure [that is] in some way unjustifiable by any government interest." *Id.* at 849. "[This] sort of official action is most likely to rise to the conscience-shocking level." *Id*. "[C]loser calls," however, are presented by conduct that is "something more than negligence but 'less than intentional.'" *Id.* A determination as to which of these standards of culpability—"intent to harm" or "deliberate indifference"—applies requires "an exact analysis of context and circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850.

The parties disagree as to what standard of culpability should apply in this case. McKinney argues that the district court should have applied the higher standard of "intent to harm" to his actions because he was responding to what he believed to be an emergency, and the plaintiff presented no evidence that he intended to harm Harkness. But even if the lesser "deliberate indifference" standard applies, he contends his actions did not demonstrate deliberate indifference and were not conscience-shocking. The plaintiff asserts that there was no emergency, and that McKinney's conduct was so egregious that it undoubtedly establishes that he acted with deliberate indifference to Harkness's life and safety. We have examined each standard in light of the facts and circumstances in this case and conclude that for purposes of summary judgment, deliberate indifference is the standard by which McKinney's conduct should be measured.

In *Lewis*, the Court made it clear that regarding police actions, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment [that is] redressible by an action under

9

§ 1983." 523 U.S. at 854. As the Court explained, the police are often called upon "to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." *Terrell*, 396 F.3d at 978 (citing *Lewis*, 523 U.S. at 853) (internal citations omitted). Thus, "the intent-to-harm standard most clearly applies 'in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation.'" *Id.* at 978 (citing *Neal v. St. Louis County Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir.2000)).

Since *Lewis*, courts have extended the application of the intent-to harm standard, holding that it applies not only "to an officer's decision to engage in high-speed driving in response to other types of emergencies, [but also] to the manner in which the police car is then driven in proceeding to the scene of the emergency." *E.g.*, *Terrell*, 396 F.3d at 979. Thus, under *Lewis*, the intent-to-harm culpability standard applies to officers responding to an emergency call. *Terrell*, 396 F.3d at 980. *See also Radecki v. Barela*, 146 F.3d 1227, 1230 (10th Cir. 1998) (intent-to-harm standard applies to "situations involving law enforcement and governmental workers deployed in emergency situations.").

Along the culpability spectrum, deliberate indifference is "an intermediate level of culpability" that can, if proven, also establish a due process violation. *See Lewis*, 523 U.S. at 848–49; *see also Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *Lewis*, 523 U.S. at 849) (conduct "falling within the middle range" of culpability— that is, conduct that is more than negligent but less than intentional—can give rise to liability under the Fourteenth Amendment). But unlike the intent-to-harm standard, this standard "is sensibly employed only when actual deliberation is practical." *Lewis*, 523

10

U.S. at 851; *see Wilson v. Lawrence Cty.*, 260 F.3d 946, 956 (8th Cir. 2001). Certainly, time to "reflect on [one's] actions" is a factor in determining whether deliberate indifference is the appropriate standard. *See Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). "[L]iability for deliberate indifference . . . rests upon the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853. Thus, when an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions. *See id.*

Under this legal framework and viewing the facts in the light most favorable to the plaintiff,[5] we find that a jury could conclude that McKinney was not responding to an emergency and had time to deliberate his actions. First, McKinney argues that he was

---

[5] For purposes of summary judgment, the district court accepted as true the plaintiff's contention that two minutes and fifteen seconds elapsed between the cancellation of the Code 3 and the collision. J.A. 70, 73. The court relied on the computer aided dispatch ("CAD") report which shows a "CODE 3" status entry at 22:32:53 p.m., and a "PRIORITY" status entry at 23:33:42 p.m. adjacent to McKinney's name. At 22:35:57 p.m., the status entry is "Case Number 2016-18359." J.A. 73. The district court held that a trier of fact could conclude that the "priority" entry reflects that the Code 3 was cancelled at 10:33:42 p.m. and that the collision occurred two minutes and fifteen seconds later at 10:35:57 p.m. J.A. 161-62. But McKinney disputes that over two minutes elapsed, suggesting instead, based on an audio recording of police radio traffic, that only forty-one seconds had elapsed. Adoption of McKinney's view, however, would require[] us to "impermissibly . . . view the facts in the light most favorable to him rather than the [plaintiff]." *See Browder*, 787 F.3d at 1081 (10th Cir. 2015).

11

responding to a potential emergency because he had been ordered to assist Lollis, who sounded "on edge or shaken," with a traffic stop. J.A. 39-40. But McKinney's argument ignores other facts that support a finding that there was no emergency. Although Hamby initially issued an emergency call and directed McKinney to assist, Lollis, after only "a few seconds," radioed that there was no emergency, stating that "units could back down on emergency response." J.A. 149. McKinney not only acknowledged the change in the status of the call but stated affirmatively that he was "backing down" to Code 1– a non-emergency response. J.A. 49; Audio Recording of Police Radio at 3:34.

Second, McKinney also had time to deliberate and consider his actions. *See Lewis*, 523 U.S. at 853. The district court, relying on the objective data found in the CAD Report—including time stamps that correspond to the deputies' radio transmissions—concluded that a reasonable jury could find that two minutes and fifteen seconds elapsed between the cancellation of the emergency response and the collision. Thus, McKinney had ample time to consider, based on his training, department policy and state law, the proper response given that the call was no longer an emergency. He deactivated his emergency lights and siren as required for non-emergency responses—indicating that he knew the situation was no longer an emergency—but did not reduce his speed to conform to the speed limit. The evidence therefore supports a finding that there was no emergency, and that McKinney had ample time to deliberate his actions. Accordingly, deliberate indifference is the appropriate standard of culpability at this posture, under the facts and circumstances of this case, to determine whether McKinney violated Harkness's substantive due process rights.

12

2.

Next, having established that deliberate indifference is the proper standard, this Court must consider whether McKinney's conduct, when viewed in the light most favorable to the plaintiff, demonstrated deliberate indifference to Harkness's to life and safety. We find that a reasonable jury could conclude that McKinney was deliberately indifferent and that his conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *See Lewis*, 523 U.S. at 847 n.8.

An officer's actions demonstrate deliberate indifference where the evidence shows that the officer subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (citing *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). *See also Terrell*, 396 F.3d at 984 (citing *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994) (deliberate indifference standard requires that the defendant disregard a known substantial risk of serious harm). A defendant's subjective knowledge of the risk may be inferred from circumstantial evidence. *Parrish*, 372 F.3d at 303 (quoting *Farmer*, 511 U.S. at 842).

We find that in this case, a reasonable jury could conclude that McKinney deliberately operated his police vehicle in a dangerous and reckless manner with full knowledge of the risks involved. The evidence supports a finding that McKinney knew that he was no longer responding to an emergency. He acknowledged the cancellation of the Code 3 and stated he was "dropping back to Code 1," a regular, non-emergency response. J.A. 49. Further, the evidence tends to show that based on his training, he understood that department policy and state law required that he deactivate his emergency

13

lights and siren and follow the speed limit. Contrary to that training, however, McKinney continued to drive at 83 miles per hour—nearly forty miles per hour over the 45-mph speed limit—on a dark, curved road with full knowledge of the risks of night driving under such conditions. Driving without his emergency lights and siren increased the danger, as it eliminated any warning to other drivers that a law enforcement vehicle was approaching at a high rate of speed. And McKinney had over two minutes to deliberate—to apply his knowledge and training to the situation, reflect on his actions, and conform his behavior—before he lost control of his vehicle and collided with Harkness. Thus, a reasonable jury could conclude that McKinney knowingly disregarded a substantial risk of serious harm, and that his deliberate indifference to life and safety was conscience-shocking, in violation of Harkness's Fourteenth Amendment substantive due process rights. *See Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 718 (3d Cir. 2018) (responding to non-emergency call at over 100 mph demonstrates conscious disregard for a great risk of serious harm); *Browder*, 787 F.3d at 1081 (where off-duty officer was not chasing suspect or responding to an emergency, "a reasonable jury could infer . . . a conscious contempt of the lives of others and thus a form of reckless indifference to a fundamental right").

## C.

McKinney argues that notwithstanding a conclusion by this Court that the plaintiff has established a substantive due process violation, he is entitled to qualified immunity because Harkness's constitutional right was not "clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (citing *Harlow*, 457 U.S. at 818). To be clearly established, the right violated must be "sufficiently clear that a reasonable official

14

would understand that what he is doing violates that right." *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004). This determination "is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances." *Id.* at 279 (citing *Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir.2003)). "'Clearly established' does not mean that 'the very action in question has previously been held unlawful,' but it does require that, 'in the light of pre-existing law the unlawfulness [of the official's conduct] must be apparent.'" *Owens*, 372 F.3d at 279 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). *See also Amaechi v. West*, 237 F.3d 356, 362 (4th Cir.2001) ("exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established").

To determine if a constitutional right was clearly established, we must examine controlling authority in this jurisdiction, which includes "the decisions of the Supreme Court, [this Circuit], and the highest court of the state in which the case arose." *Owens*, 372 F.3d at 279. If "there are no such decisions from courts of controlling authority, we may look to 'a consensus of cases of persuasive authority' from other jurisdictions if such exists." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538-39 (4th Cir. 2017) (quoting *Owens*, 372 F.3d at 280). But the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity. *See Kittoe*, 337 F.3d at 403. "We must consider not only 'specifically adjudicated rights,' but also 'those manifestly included within more general applications of the core constitutional principles invoked.'" *Booker*, 855 F.3d at 538 (citing *Wall v. Wade*, 741 F.3d 492 (4th Cir. 2014)).

15

That there is little precedent imposing liability under these specific circumstances does not necessarily mean that an officer lacks notice that his conduct is unlawful. As then-Judge Gorsuch wrote for the panel in *Browder*:

> [S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.

*Browder*, 787 F.3d at 1082–83 (citations omitted). *See also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established). Accordingly, public officials "'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was wrongful." *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) (citing *Booker*, 855 F.3d at 538). Further, this Court has found that "we need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense. In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Williams*, 917 F.3d at 770.

With this legal framework in mind, the question to be resolved is whether a reasonable officer in McKinney's position would have known that his conduct—driving a police vehicle without activating his emergency lights and siren at over 80 miles per hour on a curved, unlit road at night while not responding to an emergency or pursuing a

16

suspect—could give rise to a claim for a Fourteenth Amendment violation. As the district court noted, "there is relatively scant caselaw imposing liability in these specific circumstances." J.A. 176. Neither the Supreme Court nor this Court has considered the exact conduct presented here. McKinney urges that the facts of this case are most similar to the circumstances presented in *Lewis*, where the Court declined to find a constitutional violation. But *Lewis*, 523 U.S. at 837, as well as this Circuit's opinion in *Temkin*, 945 F.2d at 718, involved officers who caused injuries while actively pursuing a fleeing suspect. We have already established here that the facts, viewed in the light most favorable to the plaintiff, do not support a conclusion that these circumstances are akin to a high-speed chase or that McKinney was responding to an emergency. Beyond this, the parties concede that no other court decisions have addressed the factual circumstances upon which we must make a determination.

But while there is no case directly on point factually to inform our analysis, core constitutional principles set forth in numerous cases lead us to the conclusion that Harkness's substantive due process right was clearly established. *See Williamson*, 912 F.3d at 187. *Lewis* is not factually analogous to our case, but the Supreme Court did find that an officer not actively pursuing a suspect or responding to an emergency requiring quick decision-making, *i.e.*, where "deliberation is practical," may be liable based on a deliberate indifference standard for unintentional conduct. 523 U.S. at 851. *See Young*, 238 F.3d at 574-75; *see also Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) (*quoted in Lewis*, 523 U.S. at 854 n.13) (viable due process claim can arise when person suffers serious physical injury "due to a police officer's intentional misuse of [a] vehicle").

17

After *Lewis*, two Tenth Circuit cases adopted the view that an officer can be liable for a substantive due process violation under a deliberate indifference standard when not responding to an emergency or chasing a suspect. First, in *Green v. Post*, 574 F.3d 1294 (10th Cir. 2009), the court assessed the conduct of a speeding officer who was not in pursuit of anyone or responding to an emergency using a deliberate indifference standard. *Id.* at 1302-03. The Tenth Circuit then affirmed its view in *Browder*, where the court applied the deliberate indifference standard to an off-duty officer who used his emergency lights and drove at a high rate of speed on personal business, resulting in a fatal accident. The court found that proof of intent to harm is not required in cases where there is no emergency or official business. 787 F.3d at 1081. The court further noted, based on the Supreme Court's decision in *Lewis* and Third Circuit precedent, that "as of 2006, it was clearly established 'a police officer could be liable under the Fourteenth Amendment' for driving in a manner that exhibits 'a conscience-shocking deliberate indifference' to the lives of those around him." *Id.* at 1083 (citing *Green*, 574 F.3d at 1306). Similarly, the Third Circuit reaffirmed in *Sauers* that it has "been clear in recent years that the level of culpability required to shock the conscience when an officer has time for hurried deliberation is 'a conscious disregard of a great risk of serious harm.'" 905 F.3d at 717 n.6 (citing *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006)).

Thus, while the courts have yet to consider a case where an officer engaged in the same conduct as McKinney, he is not absolved of liability solely because the court has not adjudicated the exact circumstances of his case. We find that a reasonable officer in McKinney's position would have known, based on rights "manifestly included within more

18

general applications of the core constitutional principles invoked," *Booker*, 855 F.3d at 538, that an officer may be subject to a claim under the Fourteenth Amendment under a deliberate indifference standard for unintentional injuries caused when not responding to an emergency or chasing a suspect. This substantive due process right was clearly established at the time McKinney engaged in the conduct that caused Harkness's injuries. A reasonable officer in McKinney's position would have known his conduct was not only unlawful, but that it created a substantial risk of serious harm to those around him. As the court stated in *Browder*, some conduct is so obviously unlawful that an officer does not need a detailed explanation. *See* 787 F.3d at 1082. Thus, we affirm the district court's finding that "in October 2016, it was clearly established that an officer driving more than 80 mph at night, on a curved section of an unlit road, in a non-emergency, non-pursuit situation could be subject to liability under the Fourteenth Amendment for deliberate indifference to a substantial risk of harm to those around him" and that "[a] reasonable officer in McKinney's position would have realized such conduct was unlawful." J.A. 174.

Accordingly, taking the facts in the light most favorable to the plaintiff, we find that McKinney's actions were deliberately indifferent to Harkness's life and safety such that it shocks the conscience and rises to the level of a violation of a constitutional right that was clearly established at the time of the collision. We acknowledge that in the context of qualified immunity, officials are not liable for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)). But McKinney's actions, construed in the light most favorable to the plaintiff, do not constitute a "bad guess in a gray area" that qualified immunity protects.

19

*See Sims v. Labowitz,* 885 F.3d 254, 264 (4th Cir. 2018). Thus, McKinney is not entitled to qualified immunity and his motion for summary judgment on that basis must be denied.

III.

Finally, McKinney asserts that even if this Court determines that he violated a clearly established constitutional right, the plaintiff's Fourteenth Amendment substantive due process claim is barred by the *Parratt-Hudson* doctrine. *See Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part on other grounds, Daniel v. Williams*, 474 U.S. 327, 330 (1986); *Hudson v. Palmer*, 468 U.S. 517 (1984). Because the doctrine's applicability is limited to procedural due process claims, the district court correctly held that the *Parratt-Hudson* doctrine does not apply to the plaintiff's substantive due process claim.

Under the *Parratt-Hudson* doctrine, a state actor's random and unauthorized deprivation of a protected due process interest cannot be challenged under § 1983 if the state provides an adequate post-deprivation remedy. *See Parratt*, 451 U.S. at 543-44; *Hudson*, 468 U.S. at 533. *See also Bogart v. Chapell*, 396 F.3d 548, 563 (4th Cir. 2005) (where state employees do not have authority to deprive persons of their property and liberty, and have no duty to provide pre-deprivation safeguards, doctrine bars a § 1983 due process claim based on employees' random and unauthorized conduct). McKinney argues that the *Parratt-Hudson* doctrine controls the viability of the plaintiff's Fourteenth Amendment substantive due process claim, first because his actions were unauthorized, and second, because the plaintiff was afforded a post-deprivation remedy—the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10, *et seq.*, which allows plaintiffs who

20

have suffered a tortious loss at the hands of the state to recover for gross negligence by a state employee. He contends that the plaintiff's case is nothing more than a negligence action related to the operation and control of his police vehicle, and that plaintiff's Fourteenth Amendment claim—which is based on the same facts as her state claim for negligence and gross negligence—is simply a tort claim "couched in terms of constitutional deprivation [seeking relief] under § 1983." *See Parratt*, 451 U.S. at 533.

But the *Parratt-Hudson* doctrine does not bar the plaintiff's substantive due process claim. In *Zinermon v. Burch*, 494 U.S. 113 (1990), the Supreme Court limited the application of the doctrine to procedural due process claims for which the state provides an adequate post-deprivation remedy. As the Court explained, "the Due Process clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* at 125 (citing *Daniels*, 474 U.S. at 331). In such cases, "[a] plaintiff . . . may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights." *Zinermon*. 494 U.S. at 125 (internal citations omitted). Thus, "[t]he fact that the alleged wrongdoing also violated state law and could support a tort claim is not sufficient to invoke the *Parratt* doctrine." *Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015) (citing *Zinermon*, 494 U.S. at 128).

> Our Circuit has adopted the Supreme Court's reasoning, holding that
>
> [S]ome abuses of governmental power may be so egregious or outrageous that no state post-deprivation remedy can adequately serve to preserve a person's constitutional guarantees of freedom from such conduct. Thus, conduct that 'shocks the conscience' . . . violates substantive guarantees of

21

the Due Process Clause independent of the absence or presence of post-deprivation remedies available through state tort law.

*Temkin*, 945 F.2d at 720 (citing *Daniels*, 474 U.S. at 338 (Stevens, J., concurring)). *See also Lewis v. McDorman*, 820 F. Supp. 1001, 1003 n.3 (W.D. Va. 1992), *aff'd*, 28 F.3d 1210 (4th Cir. 1994) (where Fourteenth Amendment deprivation at stake is substantive, not procedural, *Parratt* does not apply, as it applies only to procedural due process violations); *McDonald v. Dunning*, 760 F. Supp. 1156, 1168 (E.D. Va. 1991) (*Parratt*'s holding that state post-deprivation remedies may constitute adequate due process is relevant only where the claim is a violation of procedural due process).

Here, the plaintiff has made only a substantive due process claim. Such a claim focuses on egregious state conduct rather than unfair procedures. McKinney's argument fails because the availability and adequacy of a post-deprivation state remedy is irrelevant to the analysis for a substantive due process claim. And according to *Zinermon*, the availability of a state law remedy for McKinney's egregious conduct does not impact the plaintiff's § 1983 suit. *Id.* at 125.

We are not persuaded by McKinney's reliance on then-Judge Gorsuch's concurrence in *Browder v. City of Albuquerque*, 787 F.3d at 1085, which suggests *Zinermon*'s application of the *Parratt-Hudson* doctrine to procedural, but not substantive, due process claims was dicta and thus "the question whether *Parratt* applies to substantive due process claims . . . remains a live and open one." *Browder*, 787 F.3d at 1085 (quoting *Lewis*, 523 U.S. at 840 n. 4). On remand, the district court acknowledged that "federal courts have been granted authority pursuant to 42 U.S.C. § 1983 'to remedy constitutional

violations by state officials acting under color of state law,' *id.* at 1083 (citing *Monroe v. Pape*, 365 U.S. 167 (1961)), and the law has been clearly established that substantive due process violations fall within this grant of authority." *Browder v. City of Albuquerque*, No. CIV 13-0599 RB/KBM, 2016 WL 4376054, at *4 (D.N.M. May 10, 2016) (citing *Zinermon*, 494 U.S. at 125).

This Court, relying upon the body of well-reasoned Fourth Circuit precedent and persuasive authority, declines to extend the *Parratt-Hudson* doctrine to the plaintiff's substantive due process claim. Such an extension would be inconsistent with the jurisprudence that recognizes the fundamental differences between substantive and procedural due process claims. Accordingly, we find that the plaintiff's Fourteenth Amendment substantive due process claim against McKinney is not barred by the *Parratt-Hudson* doctrine.

## IV.

For these reasons, we affirm the decision of the district court and remand the case for further proceedings.

*AFFIRMED*

23

RICHARDSON, Circuit Judge, dissenting:

The majority dutifully recites the familiar rule that qualified immunity shields an officer from suit unless he violated a constitutional right that was "clearly established." Yet the majority fails to faithfully follow that rule—ignoring the Supreme Court's consistent admonition that it really must be *clearly established* that the officer's particular conduct was prohibited by the Constitution.

Instead, the majority hangs its hat on a murky substantive-due-process claim. The governing constitutional standards are not clearly established. And the caselaw's application to the hurried, discrete, and torn conduct underlying this case is also not clearly established. Yet the majority ignores this compounded uncertainty to forge new law that it then finds had been "clearly established." The only course available to us as inferior-court judges is to respect the Supreme Court's instructions and hold that the officer is immune from suit. I respectfully dissent.

## I.     The doctrine of qualified immunity

The doctrine of qualified immunity—controversial, contested, and *binding*—is a familiar rule.[1] The doctrine shields the officer from suit unless his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

---

[1] To follow the thoughtful critiques and defenses of qualified immunity, start by comparing William Baude, *Is Qualified Immunity Unlawful*, 106 CAL. L. REV. 45 (2018), with Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853 (2018).

Perhaps reflecting the lack of explicit textual support in the statutory scheme, the Supreme Court has justified the doctrine as, among other things, a creature of public policy—the "best [] accommodation" of "competing values." *Harlow*, 457 U.S. at 815; *see also, e.g.*, *Pierson v. Ray*, 386 U.S. 547, 556–57 (1967) (offering a historical justification); *Screws v. United States*, 325 U.S. 91, 100–04 (Douglas, J., plurality) (suggesting a fair-notice justification); *cf. Crawford-El v. Britton*, 523 U.S. 574, 611–12 (1998) (Scalia, J., dissenting) (asserting a second-best-constitutionalism justification). On the one hand is the pressing need to ensure the "vindication of constitutional guarantees." *Harlow*, 457 U.S. at 814. *Compare Marbury v. Madison*, 5 U.S. 137, 163 (1803), *with* John C. Jeffries, Jr., *The Right-Remedy Gap in Constitutional Law*, 109 YALE L.J. 87 (1999). On the other, "claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole," creating "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Harlow*, 457 U.S. at 814 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d. Cir. 1949) (Learned Hand, J.)). The Supreme Court instructs that qualified immunity, rather than absolute immunity (or absolute liability), best reconciles these competing demands so that executive officials remain both accountable to the law and energetic in their duties—wielding the sword with neither tyranny nor trepidation. *Harlow*, 457 U.S. at 819. This balance is not perfect, but it is the law.

The resulting doctrine demands we clear a high bar before concluding that a right was "clearly established." "We do not require a case directly on point." *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 741 (2011). But we do require that "existing precedent" place the "question beyond debate," so that "'the contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015); *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Of course, reasonable officials are capable of "drawing logical inferences, reasoning by analogy, or exercising common sense." *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019). But they are not soothsayers—expected to divine what some judges might suss out of oblique prior pronouncements, only to be personally liable when they fail to see the future. *See Procunier v. Navarette*, 434 U.S. 555, 562 (1978).

To ensure that "every reasonable official" would understand the illegality of the conduct, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)); *see also al-Kidd*, 563 U.S. at 742; *Broseau v. Haugen*, 543 U.S. 194, 198 (2004). It is "not enough" to say that it is clearly established that an individual has a constitutional right to be free from unreasonable seizures. *Saucier*, 533 U.S. at 202; *see also City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015). Instead, we must examine the specifics of the existing precedents, determining whether the particulars of those cases would place a reasonable law-enforcement officer on notice that particular conduct is unlawful. *See Kisela*, 138 S. Ct.at

26

1152; *Mullenix*, 136 S. Ct. at 308; *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[2]

The Supreme Court has made it clear that "specificity is especially important" where it is "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (highlighting the needed specificity under the excessive-force doctrine of the Fourth Amendment); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (Because of its "imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered . . . Thus, we have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment . . . While there does not have to be a case directly on point . . . a body of relevant caselaw is usually necessary to clearly establish the answer." (cleaned up)). The more unclear the general rule, the more specific the circumstances must be to find clearly established law. *Id*.

The required specificity is especially important when the claim depends on substantive due process, which is even more unclear generally and offers even less

---

[2] The Supreme Court repeatedly reminds courts how high the "clearly established" bar is. *See, e.g.*, *City of Escondido*, 139 S. Ct. at 503; *Kisela*, 138 S. Ct. at 1152; *Wesby*, 138 S. Ct. at 593; *White*, 137 S. Ct. at 551; *Mullenix*, 136 S. Ct. at 308. Indeed, over the last 35 years, the Supreme Court has found that official conduct violated "clearly established law" in two cases, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004), and *Hope v. Pelzer*, 536 U.S. 730, 741–42 (2002). Baude, 106 CAL. L. REV. at 82 n.1. *Groh* involved a warrant that completely failed the particularity requirement while *Hope* involved the use of a hitching post for prison discipline despite several sources declaring that particular practice unconstitutional. 540 U.S. at 564; 536 U.S. at 741–42.

guidance in particular circumstances than Fourth Amendment jurisprudence. This is because "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended . . . [thus] self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). In finding a substantive-due-process right, the Court requires a close analysis of the "Nation's history and tradition" and requires a "careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Recognizing the complexities and uncertainties of this doctrine, other courts have described this process as "wad[ing] into the murky waters of that most amorphous of constitutional doctrines, substantive due process." *Tun v. Whitticker*, 398 F.3d 899, 900 (7th Cir. 2005). The lack of clarity surrounding substantive due process—and the Court's admonishments in this area—cautions us to seek cases that address the specific circumstances at hand to find clearly established law.

In looking for clearly established law that gives a defendant "fair warning" that his particular conduct was unlawful, we turn first to the Supreme Court. *City of Escondido*, 139 S. Ct. at 503. We also consider our own controlling circuit precedent. *Williams*, 917 F.3d at 769. And our Circuit has held that we may also find 'fair warning' for a reasonable officer by canvassing the mass of cases from the thirteen judicial circuits in search of a "robust consensus of persuasive authority." *Id.* But no matter how wide we cast our net, we must heed the repeated admonition that the standards for a law to be 'clearly established' remain specific and demanding. *See, e.g.*, *al-Kidd*, 563 U.S. at 741.

28

## II.    The officer is entitled to qualified immunity

The majority, regrettably, forgets that qualified-immunity doctrine is a demanding standard requiring specificity.  Whatever the first-principles answers to the questions raised here, the majority's fundamental problem is simple:  no clearly established law placed the unconstitutionality of this officer's conduct beyond debate.

According to the plaintiff, Officer McKinney violated her right to substantive due process by colliding with her vehicle while the officer, in violation of state law, was exceeding the speed limit.  Around 10:30 p.m., Deputy Lollis radioed a request for assistance with a traffic stop.  The Shift Supervisor believed that Lollis's voice sounded "shaken" and issued a "Code 3" "emergency response" for nearby officers to help.  J.A. 40–43, J.A. 75.  A "Code 3" allows officers to disregard traffic regulations using emergency lights and sirens.  *See* S.C. Code Ann. §§ 56-5-760; 56-5-4700; 56-5-4970.  Shortly after the "Code 3," Lollis radioed to "back down on emergency response but continue to him 'priority.'"  J.A. 43, 149.  It is contested whether the accident occurred forty seconds after the "Code 3" cancellation or if two minutes elapsed.  But either way, Officer McKinney had acknowledged the "Code 3" cancellation and turned off his emergency lights and siren.  Officer McKinney then hit Janel Harkness's vehicle—severely injuring her—while traveling at least 83-mph around a curvy road in the dark.

The majority divines clearly established law that showed the officer's actions were constitutionally prohibited.  This is wrong for two interrelated reasons.  First, the general legal standards here are unsettled.  And second, even accepting the majority's preferred legal standard, its specific application here is unsettled as well.  Although I respect the

29

majority's valiant effort to deduce clearly established law from such compounded uncertainty, the majority's trudge through this murky morass suggests a simple truth—if clearly established law is so hard to find, perhaps that is because it does not (yet) exist.[3]

## A.     Lack of clearly established standards

The majority's first problem is that the general standard the majority requires to reach its result is far from clearly established.   Diving into an area with broad indeterminacies, the majority fails to prove that it is beyond debate what general standard should be applied.  Though it settles on requiring 'deliberate indifference' rather than an 'intent to harm,' the majority's conclusion is anything but compelled by prior caselaw.

### 1.     Substantive due process

To begin, the standards for substantive-due-process violations are famously unclear and frequently underdeveloped.  Perhaps struck by the "great silences" of the Fourteenth Amendment's Due Process Clause, *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949); *see* U.S. CONST. amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law . . ."), the Supreme Court has articulated

---

[3] At the outset, I acknowledge that the doctrine of substantive due process, like qualified immunity, remains controversial in many quarters.  *See* John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 18 (1980); *United States v. Carlton*, 512 U.S. 26, 39−42 (1994) (Scalia, J., concurring).  Everyone seems to recognize that this doctrine, perhaps because of its unusual textual foundation, is often uncertain in its rules and unsettled in its applications.  *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (observing that "guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended" (cleaned up)).  Yet we are bound as inferior-court judges to follow the Supreme Court's instructions, whatever their contested status.  Regrettably, as discussed below, the majority only respects this role for inferior courts halfway—pulling its punches on qualified immunity's clear requirements while aggressively expanding what few substantive-due-process cases we have.

30

the governing test for substantive due process in highly general—sometimes diverging, but firmly demanding—terms. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The governing test for substantive due process is a two-part inquiry. *See id.*; *Glucksberg*, 521 U.S. at 720–21; *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978). We first ask whether the government has infringed a carefully described fundamental right. *See Glucksberg*, 521 U.S. at 720–21; *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); *Zablocki*, 434 U.S. at 387. That first step is undisputed here, since no one doubts that the collision was a direct and substantial impairment of the plaintiff's fundamental right. So everything here turns on the second step, whether the "executive action . . . can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense," so that it lacks "any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 847 (quoting *Collins*, 503 U.S. at 115). "[T]he Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Id.* at 848 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).[4] So "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 846. The conduct must truly "shock the conscience." *Id.* at 847 n.8.

But that broad "shocks the conscience" standard, whatever its virtues or vices, is "no calibrated yardstick." *Id.* at 847. And while it might "point the way," this amorphous

---

[4] South Carolina established the "South Carolina Tort Claims Act" as "the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C. Code §15-78-200. Though these plaintiffs brought a tort action as prescribed by the South Carolina Tort Claim Act, they also sought to add a constitutional due process claim that extends beyond the state's limitations on suits against government employees.

and malleable test—by itself—fails to provide enough guidance to hold that the officer violated clearly established law. *See id.* at 846–47 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d. Cir. 1973) (Friendly, J.)); *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1078–80 (10th Cir. 2015) (surveying "what guidance we've received in this murky area"). So the majority turns to another general standard.

### 2. Culpability spectrum

Searching for more specificity, the majority looks to the "culpability spectrum" provided by *Lewis*. There, the Court provided some guidance (though not clear directions) for evaluating when executive action violates substantive due process. *See Lewis*, 523 U.S. at 845–54. On the Supreme Court's "culpability spectrum," "negligence" is never enough to find a substantive-due-process violation, "deliberate indifference" is only sometimes enough, and "intent to harm" is usually enough. *Id.* The majority claims that it is clearly established that the plaintiff's substantive-due-process right is violated here so long as the officer's conduct was "deliberately indifferent."

I am not persuaded. At most one might decide that the deliberate-indifference standard should apply to a substantive-due-process claim where there is 'actual time for deliberation,' like when addressing a prison inmate's medical condition. *See Lewis*, 523 U.S. at 851, 853; *Green v. Post*, 574 F.3d 1294, 1301 n.8 (10th Cir. 2009) (reflecting that "the meaning of the term 'deliberation,' and a determination of when an officer has time for 'actual deliberation,' is elusive" and "context-specific"); *see also Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (instructing that "deliberate indifference," in "limited circumstances," can be "sufficiently shocking to the conscience that it can

32

support a Fourteenth Amendment claim"). But it is not clearly established that the type of conduct here—hurried, discrete, and torn between the competing needs of speed and safety (to say nothing of the only recently downscaled emergency call)—constitutes the type of unhurried, iterative, and uncomplicated deliberation that is classically subjected to the deliberate-indifference standard. *See Lewis*, 523 U.S. at 851, 853. This doubt as to the proper standard persists wherever we turn—the cases and their lessons are too sparse, too distinguishable, and too conflicted to clearly establish that 'deliberate indifference' is the right standard here.

### a.    Controlling caselaw

Controlling authority from the Supreme Court and our Circuit fails to clearly establish that the deliberate-indifference standard applies in reviewing the officer's conduct here. *See William*, 917 F.3d at 769.

### i.    Supreme Court

Start with Supreme Court precedent. There is not much here for the majority to rely upon (as the majority seems to concede). Indeed, the only real decision on which the majority stakes its claim is *Lewis*. But that decision—even if it provides a helpful framework for structuring the analysis—does not provide clear answers that resolve the fight over the legal standard here.

While *Lewis* recognized a "culpability spectrum" that governs claims like the one before us here—with negligence being "categorically" insufficient, and intent to harm being "most likely sufficient"—the Court was careful to avoid establishing when "culpability falling within the middle range" would be enough. *Lewis*, 523 U.S. at 849

33

(observing that this conduct "is a matter for closer calls").  Within this uncertain middle range, the Court clarified, there are some potentially helpful guideposts.  One guidepost is in the custodial prison context, where "liability for deliberate indifference . . . rests upon the luxury of unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," and so the deliberate-indifference standard is "sensibly employed only when actual deliberation is practical."  *Id*. at 851 n.11, 853.  The holding in *Lewis* itself provided another guidepost.  For actions taken during a high-speed chase aimed at apprehending a suspected offender, where unforeseen circumstances demand an instant judgment on the part of an officer who feels the pulls of competing obligations, only an intent to cause harm will satisfy the shocks-the-conscience test.  *Id.* at 853–55.

But those guideposts fail to provide answers for the appropriate standard to apply here.  How are we—much less an officer—to know where on the spectrum an officer responding to a recently downgraded emergency call for assistance falls?  Does that situation have the type of prolonged, iterative, and uncomplicated opportunity for deliberation that *Lewis* observed generally justifies application of the deliberate-indifference standard?  Or does that situation look more like "decisions [that] have to be made in haste, under pressure, and frequently without the luxury of a second chance" in "circumstances that are tense, uncertain, and rapidly evolving" with "obligations that tend to tug against each other"?  *Id.* at 853 (instructing that prison officials tasked to quell a riot or police officers engaging in a high-speed chase are not subject to the deliberate-

34

indifference standard).  Maybe others think it obvious, but this framework fails to provide me with certainty, much less fair notice to a reasonable officer in his patrol car.

### ii.    Fourth Circuit

Our own precedents provide no greater clarity.  Like other circuits, we have wrestled with what to make of *Lewis*, continually failing to definitively identify what standard should govern an officer's non-emergency response to a request for assistance.

What cases we have in this general area are scarce and, just as importantly, more than a little unclear on how to extend their lessons to contexts beyond the particular circumstances they consider.  Even viewing the few cases we have at a higher level of generality—something the Supreme Court prohibits, *see City of Escondido*, 139 S. Ct. at 503—fails to establish that the deliberate-indifference standard must apply here.  *See Young v. City of Mount Ranier*, 238 F.3d 567, 574–76 (4th Cir. 1991) (applying the deliberate-indifference standard to review the death of a suspect in police custody, based on the unique context of the suspect's detention in a prison setting).

Indeed, the most analogous guidance we have instructs us that the deliberate-indifference standard cannot apply.  In *Temkin v. Frederick County Commissioners*, we refused to apply the deliberate-indifference standard or find a substantive-due-process violation when an officer struck a bystander with his vehicle during a long-lasting high-speed chase that proceeded from a minor legal violation and that implicated violations of police protocols.  945 F.2d 716, 721–23 (4th Cir. 1991) (gathering similar cases from other circuits).  And while a jurist can find distinctions, *Temkin* alone should preclude finding that it is clearly established that the deliberate-indifference standard applies here.

35

At their very most, our few precedents in this area offer far too little.  There are some contexts that call for the deliberate-indifference standard (*Young*'s pretrial detention).  But we also know that this standard is inappropriate in other contexts (*Temkin*'s high-speed car chases).  Yet our law does nothing to firmly place the type of conduct here on the end of the spectrum that justifies applying deliberate indifference.  If anything, it seems telling that in the closest *situation* to our case—the high-speed chase in *Temkin*—we rejected the very deliberate-indifference standard that the majority seeks to apply.[5]

### b.    Persuasive authority

With no help from controlling precedent, the majority must turn elsewhere.  But that too turns up dry.  Try as it might, the majority fails to show that a "robust consensus of persuasive authority" clearly establishes that the deliberate-indifference standard applies here. *Williams*, 917 F.3d at 769.  The majority does not make any serious attempt to establish a truly robust 'consensus.'  Instead, the majority relies on a smattering of passing citations and on brief nods to a handful of tangentially related Third and Tenth Circuit decisions, which is understandable given that the cases are, as everyone concedes, few and far between. *See* Majority Op. 18–19; *see also id.* 10–11.  And the limited caselaw that the majority does rely on—fairly sparse, often distinguishable, and somewhat conflicted—

---

[5] Indeed, we have, like *Lewis*, recognized that the hallmarks of substantive due process for violations by executive officials are far from certain and depend on the particular context in which the conduct took place—further undermining the contention that our precedent clearly establishes that the deliberate-indifference standard should apply to the novel situation before us. *See Temkin*, 945 F.2d at 723 n.5; *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991); *Young*, 238 F.3d at 574–75; *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999).

does not clearly establish that the hurried, discrete, and torn conduct here is subject to the deliberate-indifference standard. Instead of clear answers, this caselaw leaves us with landmarks at the polar extremes of the doctrinal spectrum—with some cases applying the deliberate-indifference standard (generally distinguishable) and other cases applying the higher intent-to-harm standard (generally closer). But it provides no clear guidance that tells us, beyond debate, where we should put this officer's conduct on the spectrum between the two extremes.

At one end of the spectrum, some cases brought to our attention by the plaintiff apply the deliberate-indifference standard. Those cases affirm the Supreme Court's broad principle that 'actual time to deliberate' generally triggers the deliberate-indifference standard. But in doing so those cases deal with different situations and thus provide little guidance for how we should consider the conduct here.[6] While these cases are neither clear nor consistent on which factors count for how much in different situations (part of the problem for the majority), they seem far afield from what we have before us.

The closest cases the majority has—the Tenth Circuit's decisions in *Browder* and *Green* and the Third Circuit's decision in *Sauers*—do little to convince me that the conduct

---

[6] *See, e.g.*, *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 431–32 (2d. Cir. 2009) (applying the deliberate-indifference standard where officers failed to respond to a request for protection from domestic violence, where repeated requests had been made over time and did not require officers to balance competing considerations in formulating response); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006) (applying the deliberate-indifference standard where a school teacher failed to protect minor students by leaving those students alone with a classmate known to have behavioral problems as the teacher "had the opportunity to reflect and deliberate before deciding to [leave] children unsupervised in the classroom" and "did not need to make a split-second decision").

here falls under the rubric of the deliberate-indifference standard. While the *Browder* decision applied the deliberate-indifference standard, it did so where the officer was on his personal time, not pursuing any official business at all. *See Browder*, 787 F.3d at 1080–81 (applying the deliberate-indifference standard where the officer had been speeding for eight minutes on his personal time, with no official business or emergency). And the *Green* decision, beyond whatever differences we might draw, is at most one dim point in a confused constellation that the majority calls on to answer the case before us today. *See Green*, 574 F.3d at 1301 n.8, 1310 (recognizing that whether there is sufficient time to deliberate is "elusive" and "context-specific," and holding that the deliberate-indifference standard was appropriate when an officer collided with another car while engaged in a high-speed chase of a car that had stolen gasoline). In fact, after finding that the officer did not act unconstitutionally, the Tenth Circuit in *Green* concluded that it was "not clearly established what specific standard applied to the particular facts of this case—*i.e.*, where the officer was engaged in a high-speed non-emergency response." 574 F.3d at 1304 (surveying different circuits).

The *Sauers* decision, also distinguishable, cuts the other way by refusing to apply the deliberate-indifference standard to a high-speed, long-lasting chase of a suspect for a minor traffic offense. *See Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717–18 (3d Cir. 2018). Rather than provide clarity, the Third Circuit only muddied the waters further by applying its own unique standard—higher than deliberate indifference but lower than intent to harm. *Id.* The Third Circuit has held that when officers have time to engage in "hurried deliberation," there will be liability when those actions "reveal a conscious

38

disregard of a great risk of serious harm." *Id.* The Third Circuit applied this higher standard rather than deliberate indifference where an officer lost control of his car and hit the plaintiff while engaged in a high-speed pursuit (sometimes exceeding 100-mph) over a non-emergency "summary traffic offense." *Id.* at 715. The Third Circuit found that the officer violated the Constitution in this situation, but after surveying cases from across the country, including *Green*, the court held that the law had not been clearly established. *Id.* at 719–23.

After granting qualified immunity, the Third Circuit stated that its decision would establish the law for similar cases within that circuit. *Id*. at 723. But *Sauers* cannot provide clearly established law here, as *Sauers* came two years after this crash. *See Wesby*, 138 S. Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."); *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995) (stating that one "analyze[s] the law at the time of the alleged conduct in order to determine whether the plaintiff has established that the defendant's conduct, when perpetrated, violated clearly established law" (quoting *Hinton v. City of Elwood,* 997 F.2d 774, 779–80 (10th Cir. 1993))); *see also* Majority Op. 18–19 (analyzing the law at the time of the accident in October 2016 but also relying on *Sauers*). Whatever utility *Sauers* offers the Fourth Circuit in this area now, it could not have provided notice to the officer here.

And whatever alleged 'consensus' might be drawn from those cases is undermined by other cases applying the intent-to-harm standard in analogous circumstances. As this Circuit did in *Temkin*, those cases suggest that where an officer is tasked to respond immediately to an unfolding situation in a manner that balances the competing needs to

39

respond quickly but drive safely, something more than deliberate indifference is generally required.  As the Third Circuit noted, "the Eighth and Ninth Circuits [] have adopted an 'intent to harm' standard for all police pursuit cases, whether or not an emergency existed at the time of pursuit." *Sauers*, 905 F.3d at 721.[7]

Taking these cases together, no consensus, much less a robust one, emerges. Reasonable arguments exist that the conduct here—hurried, discrete, and torn between competing interests in responding quickly but safely to a newly downscaled call—falls either on the "deliberate indifference" or "intent to harm" side of the line (or perhaps somewhere in-between).  The situation here required a quick (but not split-second) response.  It implicated important (but not compelling) interests.  And it involved an urgent (but no longer an emergency) situation.  So what to make of the precise conduct here is challenging.  Without a clearly established general standard, the majority's case for stripping the officer of qualified immunity is off to a poor start.

## B.    Lack of clearly established application

Even were one to find a robust consensus requiring the officer act with only deliberate indifference and not an intent to harm, the application of that standard to the

---

[7] *See Sitzes v. City of West Memphis*, 606 F.3d 461, 464 (8th Cir. 2010) (requiring intent to harm where officer crashed into a car while driving in excess of 80-mph on a 30-mph road without sirens or lights in response to a robbery of $55 and an alleged assault even though the crime was not ongoing and other officers were already en route); *Terrell v. Larson*, 396 F.3d 975, 978–79 (8th Cir. 2005) (applying the intent-to-harm standard where officer collided with bystander while engaged in high-speed response to an emergency domestic disturbance call);  *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008) (agreeing with the "Eighth Circuit and declin[ing] to try to draw a distinction between 'emergency' and 'non-emergency' situations involving high-speed chases aimed at apprehending a fleeing suspect").

particular conduct here was not clearly established.  *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004).  In part, this is because "deliberate indifference is a very high standard," so "in order to be liable under this standard, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference."  *Id*. (cleaned up).  The analysis is highly context dependent, as the "rules of due process are not . . . subject to mechanical application in unfamiliar territory.  Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  *Lewis*, 523 U.S. at 850.

While the majority contends that "core constitutional principles" establish the substantive-due-process violation alleged here, Majority Op. 17 (citing *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018)); *cf. Southern Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting), the majority's concession that there is "little precedent imposing liability under these specific circumstances" is a telling sign about the state of the law in this muddled, underdeveloped area.  Majority Op. 16; *see also al-Kidd*, 563 U.S. at 741 (explaining why that concession is not an ideal starting place on the path to the ultimate conclusion that a rule of constitutional law was "clearly established").

### 1.    Controlling caselaw

To begin, our "controlling precedent" does not establish that the officer's conduct clearly violated the plaintiff's substantive-due-process right.  No Supreme Court case has

imposed liability in an even remotely similar circumstance. *See Lewis*, 523 U.S. at 853–54 (rejecting a substantive-due-process claim where police engaged in a high-speed chase of a motorcycle for speeding and failing to stop before crashing into the motorcycle). Nor has any Fourth Circuit case done so. *See, e.g.*, *Temkin*, 945 F.2d at 723 (rejecting a substantive-due-process claim when the plaintiff was struck by a suspect fleeing during a high-speed chase, even though the chase continued over ten-miles, began because of a minor violation, occurred after officers already had a partial identification of the license plate, and violated police protocols during the chase).

### 2. Persuasive caselaw

The only source left for the majority to find clearly established law—persuasive out-of-circuit cases that might form a "robust consensus" on the question—does little more to establish that the officer's hurried, discrete, and torn conduct reflected such deliberate indifference that it unquestionably shocks the conscience. Even leaving aside the majority's lack of any attempt to establish a robust consensus of caselaw that applies the deliberate-indifference standard to factual contexts like the scenario presented here, the handful of cases that the majority cites to assert that the officer's conduct was deliberately indifferent are not very helpful.

The only decision brought to our attention that found that the officer violated clearly established law in even remotely similar circumstances—then-Judge Gorsuch's decision for the Tenth Circuit in *Browder*—is distinguishable along several fronts. The most obvious distinction is that the officer in that case was "on no one's business but his own," while the officer here was engaged in an on-duty response to another officer's call for

42

assistance. *See Browder*, 787 F.3d at 1077. The Tenth Circuit made clear that the officer was not "pursuing any emergency or any official business at all," so that "[t]he officer in these circumstances face[d] no tug between duties owed to two sets of innocents, . . . no emergency, no one . . . call[ing] for his aid, and [sat] instead in the same place as everyone else when it comes to respecting the rights of others." *Id*. at 1081. The officer here, on the other hand, was responding to another officer's call for assistance that had just been downgraded from an emergency.

The remaining decisions relied on by the majority that apply anything like the deliberate-indifference standard undermine, rather than support, the majority's result. Most importantly, the Tenth Circuit's decision in *Green* found no constitutional violation even though the officer driving a patrol vehicle without lights or sirens struck another vehicle at "a high level of speed" in an intersection where the light was turning yellow, while in pursuit of "a vehicle suspected of driving away from a gas station without paying for approximately $30.00 worth of gas." 574 F.3d at 1296–97. The officer admitted that this was not an "emergency situation" but merely trying "to catch up to the suspected violator of the law, to verify that it was the vehicle involved in the theft of the gas." *Id*. at 1297. The court applied the deliberate-indifference standard but found that the conduct did not violate the Constitution because "while not an emergency, [the situation] nonetheless required a rapid response." *Id*. at 1303–04. Again, the officer in our case was responding to a call for assistance that began as an emergency call and was downgraded just before the crash. To borrow from *Green*, this case too required a "rapid response," and thus no violation occurred. *Id*.

43

The Third Circuit in *Sauers* applied its own unique standard but did find that the officer's conduct leading to a wreck during a high-speed chase of a traffic offender was unconstitutional. 905 F.3d at 717–18. But in doing so, the Court recognized that there was no clearly established law at the time of the crash in 2014 and granted qualified immunity. *Id.* Decided two years after the wreck in this case, the *Sauers* decision provides no support for the majority.

The majority's cited cases hardly constitute the "body of relevant case law . . . necessary to clearly establish the answer" in this specific circumstance, especially when the standard to be applied is as general and amorphous as the substantive-due-process claim is here. *Wesby*, 138 S. Ct. at 590. And so, taking these controlling and out-of-circuit cases together, it is not clearly established that the officer's conduct here was so deliberately indifferent to the plaintiff's substantive-due-process rights that it shocked the conscience.[8] The 'shocks-the-conscience' inquiry, sometimes narrowed to the deliberate-indifference standard, is a demanding test in the best of times. But here, when asked to run it through the qualified-immunity analysis, the only thing that is clear is that the majority falls short. What cases and instructions we have are too sparse and too distinguishable to

---

[8] The majority does little to line up the particular conduct here with the particular conduct reviewed in related decisions. *See* Majority Op. 16 ("That there is little precedent imposing liability under these specific circumstances does not necessarily mean that an officer lacks notice that his conduct is unlawful."). Given the scant and uncertain caselaw reviewing situations like this, the majority instead resorts to "core constitutional principles," *id.* 17, relying on broad generalizations to conclude both that conduct occurring after actual time for deliberation is actionable if taken with deliberate indifference and that such deliberate indifference was present here. But that is not how we have been instructed to apply the qualified-immunity doctrine.

44

provide a sound foundation for concluding that the officer here is not entitled to qualified immunity, whether we consider the lack of clearly established standards or their unsettled applications to the conduct in this case.

## C.    Aggregated uncertainty

The problems with the majority's decision so far—its failure to show either clearly established standards or applications that lead to its sought-after result—are not unique. What is special here, and part of what makes today's decision troublesome, is how the majority's isolated errors at each step of the analysis compound. Although the majority engages in a two-step approach to the qualified-immunity analysis (first considering the standard and then considering that standard's application), the majority neglects to consider the extent to which doubts as to the standard (step one) and doubts as to its application (step two) must be *aggregated* to determine whether the officer violated clearly established law. Rather than aggregating the uncertainty inherent at each step of the analysis, the majority treats each in isolation as a threshold requirement with no carryover effect—violating a rule of elementary statistics.[9] And so, while I believe that the majority has stumbled at each step of its analysis, I also believe that the majority's decision today has created a more serious problem. That is, the majority apparently proposes that when engaged in a multi-step analysis in search of clearly established law, the doubts at each step of the analysis need not be aggregated at the end. Surely, there must be at least *some*

---

[9] To see why this is problematic, imagine that one was 60 percent sure that the proper standard is deliberate indifference and, similarly, 60 percent sure that the officer's conduct was deliberately indifferent. The aggregated confidence in an outcome of liability would not be 60 percent but less than 40 percent.

relationship between how confident we are that we are using the right doctrinal yardstick and how confident we are that the officer's conduct falls short. But the majority, apparently, finds none. That is a mistake.

*　　　*　　　*

What happened to Harkness was a tragedy (one for which state tort law provides a remedy). But there is no clearly established constitutional law here. This case arises at a seldom-visited crossroads in our doctrinal landscape—the rare rendezvous where the demanding requirement that the law must be "clearly established" meets the famously malleable set of amorphous commitments that go by the name of "substantive due process." Sometimes, the common-law process, developing from one case to the next, can distill clear answers from even the murkiest fonts. But that is not the case here. As the majority itself seems to acknowledge, the cases in this area of law are scarce. And the more abstract and general the standard, the more concrete and specific the application must be. Yet what cases we have are distinguishable and countered by cases cutting the other way—leaving us with little guidance on what to do with the hurried, discrete, and torn conduct here. Without clear standards with clear application, the only thing that seems clearly established is that the majority has gone awfully far afield from the Supreme Court's instructions.

What, then, to make of today's decision? With no clearly established law, perhaps it has less to do with the Supreme Court's qualified-immunity doctrine and more to do with misgivings about the wisdom of that doctrine. Those misgivings, to be sure, are understandable. Even after all these years, the doctrine of qualified immunity remains controversial, and there are thoughtful reasons for reconsidering or reforming it. But those

46

are decisions for the Supreme Court (or Congress).  Not us.  And so, with respect for my colleagues, I cannot join an opinion that I fear will have the effect of quietly diluting and tacitly cheapening a doctrine that we are bound to apply so long as it remains standing.  I respectfully dissent.