**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2059**

———————

DANIELLE WASHINGTON, Personal Representative of the Estate of Calvin Witherspoon Jr.,

        Plaintiff - Appellant,

v.

HOUSING AUTHORITY OF THE CITY OF COLUMBIA, a/k/a Columbia Housing Authority, a/k/a Columbia Housing,

        Defendant - Appellee.

———————

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Joseph F. Anderson, Jr., Senior District Judge.  (3:21-cv-00148-JFA)

———————

Argued:  October 27, 2022                Decided:  January 19, 2023

———————

Before GREGORY, Chief Judge, WYNN, Circuit Judge, and FLOYD, Senior Circuit Judge.

———————

Reversed and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Gregory and Senior Judge Floyd joined.

———————

**ARGUED:**  Richard Allan Hricik, LAW OFFICES OF RICHARD A. HRICIK, Mount Pleasant, South Carolina, for Appellant.  Charles Franklin Turner, Jr., WILLSON JONES CARTER BAXLEY, P.A., Greenville, South Carolina, for Appellee.  **ON BRIEF**: Amanda C. Dure, PANGIA LAW GROUP, Washington, D.C., for Appellant.

———————

WYNN, Circuit Judge:

This case arises out of the death of Calvin Witherspoon, Jr., who died of carbon monoxide poisoning at his city-owned apartment in Columbia, South Carolina. Plaintiff Danielle Washington, Witherspoon's daughter and the personal representative of his estate, appeals the district court's dismissal of her complaint against the City of Columbia Housing Authority ("Housing Authority") for failure to state a claim upon which relief could be granted. Because we conclude that Plaintiff has alleged sufficient facts to plead a § 1983 claim against the Housing Authority, we reverse and remand for further proceedings.

I.

We recount the facts as alleged in the complaint, accepting all well-pleaded factual allegations as true. *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 385 (4th Cir. 2014).

On January 17, 2019, Witherspoon died of carbon monoxide poisoning in his apartment at Allen Benedict Court Apartments, a housing complex owned and maintained by the City of Columbia Housing Authority. The city police and fire chiefs concluded that the cause of Witherspoon's death was a faulty, thirty-year-old furnace that had caused carbon monoxide to leak into his apartment, as well as several others.

The Housing Authority originally installed the gas-burning furnace in 1990 but had never regularly inspected, tested, or maintained it. And ultimately, a build-up of debris caused the furnace's carbon monoxide venting to stop functioning. The problem went

undetected because "carbon monoxide detectors [were] missing in all 244 units" of the complex. J.A. 31.[1]

In fact, Witherspoon wasn't the only person to suffer the consequences that January night. Another tenant, Derrick Roper, also died from carbon monoxide poisoning, and several other tenants were hospitalized due to carbon monoxide exposure. Following the incident, the entire apartment complex was evacuated, and all tenants were relocated.

The police and fire chiefs determined that Witherspoon's death was entirely preventable had the Housing Authority performed regular maintenance. Yet they found that the Housing Authority had performed no preventative maintenance on appliances at the complex, maintenance reports were inadequate or incomplete, and tenants who lived at the apartments believed that "if they complained, things would not be fixed." J.A. 30. The Housing Authority only had a single inspector for all 2,600 of its housing units. And ultimately, an inspection of the apartments revealed 869 code violations, ranging from missing carbon monoxide detectors and faulty smoke detectors to exposed wires and expired fire extinguishers. The fire chief found that several stoves were leaking natural gas, presenting a "severe risk for the community and its occupants." J.A. 31.

The Housing Authority was required by state and local law to install carbon monoxide detectors in each unit. But none were found in any of the units at Allen Benedict Court. The Housing Authority itself had recognized before Witherspoon's death that a missing carbon monoxide detector was a "life-threatening condition." J.A. 29. And because

---

[1] Citations to the "J.A." refer to the parties' Joint Appendix filed in this appeal.

of that, in 2017—more than a year before Witherspoon's death—the Housing Authority adopted a "Life-Threatening Conditions" policy ("Policy 8-1.C") for privately owned properties, requiring that residents immediately install a carbon monoxide detector within 24 hours if one was missing or inoperable. *Id.* The policy also identified a heating system with improper venting as a life-threatening condition because it "may cause improper or dangerous venting of gas." *Id.* Yet the Housing Authority "elected not to apply this policy to its *own* properties," including the apartments at Allen Benedict Court. *Id.* (emphasis added).

In early 2021, Plaintiff sued the Housing Authority under 42 U.S.C. § 1983, alleging that the Housing Authority violated Witherspoon's Fourteenth Amendment substantive-due-process rights, including his right to bodily integrity. And under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), she alleged that the Housing Authority caused this constitutional violation by acting with deliberate indifference through several policies and customs and by failing to train its employees.

Regarding her *Monell* claim, Plaintiff alleged that the Housing Authority elected to apply Policy 8-1.C only to privately owned apartments, rather than to Allen Benedict Court and the other low-income apartment complexes that the Housing Authority owned. Additionally, she alleged that the Housing Authority had "an unofficial policy or custom of willful neglect to the properties it owned by engaging in gross mismanagement of resources and finances, insufficient budgeting, absence of oversight, and gross neglect of maintenance, repair and capital improvements in its properties." J.A. 21. She alleged that this mismanagement was a conscious choice by the Housing Authority for financial gain:

it led "the properties [to become] so dangerously unsafe and uninhabitable that they became eligible for federal grants." *Id.* Lastly, Plaintiff alleged that the Housing Authority's inadequate training and supervision of its employees regarding compliance with applicable housing laws led to the violation of Witherspoon's constitutional rights.

In response, the Housing Authority filed a motion to dismiss for failure to state a claim, arguing that Plaintiff failed to allege conduct that was so arbitrary and egregious as to shock the conscience and therefore amount to a constitutional violation. Additionally, the Housing Authority contended that there was no causal nexus between its policies and the alleged constitutional violation.

The district court agreed, concluding that Plaintiff's allegations failed to show a constitutional violation because the Housing Authority's actions amounted to, at most, only negligence, rather than deliberate indifference. The court also concluded that Plaintiff failed to plead sufficient facts to establish causation because she "failed to allege facts showing the alleged deficiencies made Witherspoon's death bound to happen rather than merely likely to happen." *Washington v. Hous. Auth. of City of Columbia*, No. 3:21-cv-00148-JFA, 2021 WL 3886595, at \*7 (D.S.C. Aug. 31, 2021). Plaintiff timely appealed.

## II.

On appeal, we review de novo a district court's dismissal of a complaint for failure to state a claim. *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532 (4th Cir. 2022). In conducting this review, we accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018).

5

"[T]o survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege facts which, if true, 'state a claim to relief that is *plausible* on its face.'" *Owens*, 767 F.3d at 403 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). As such, "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Id.* (citing *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2006)). And a plaintiff fails to meet this standard "only when he offers 'labels and conclusions' or formulaically recites the elements of his § 1983 cause of action." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## III.

"When a § 1983 claim is asserted against a municipality," as here,[2] we must answer two questions: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Covenant Media of S.C., L.L.C. v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). We consider these questions in turn.

## A.

To prove a violation of substantive-due-process rights under the Fourteenth Amendment, a plaintiff must show that a defendant's behavior was "so egregious, so

---

[2] The Columbia Housing Authority is authorized by S.C. Code Ann. § 31-3-10 *et seq.*, and "was created by and for the City of Columbia . . . for the purpose of providing decent, safe and sanitary housing to the low and moderate-income residents of the City of Columbia." J.A. 20. As a local governing body, the Housing Authority can be sued for monetary, declaratory, or injunctive relief for depriving a plaintiff of constitutional or civil rights. *See Monell*, 436 U.S. at 690; *Hayes v. Poe Homes Hous. Project Mgmt.*, 931 F.2d 886 (4th Cir. 1991) (unpublished table decision).

6

outrageous, that it may fairly be said to shock the contemporary conscience." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (quoting *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005)), *cert. denied*, 141 S. Ct. 2800 (2021). To be conscience shocking, a defendant's behavior must lack "any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

Although "the measure of what is conscience shocking is no calibrated yard stick," it does "'poin[t] the way.'" *Id.* at 847 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). And to that end, the Supreme Court has "described a 'culpability spectrum' along which behavior may support a substantive due process claim." *Dean*, 976 F.3d at 414 (quoting *Lewis*, 523 U.S. at 848–49).

On one end of the spectrum is "conduct intended to injure [that is] in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. Such conduct most likely rises to the conscience-shocking level. *Id.* On the other end is "negligently inflicted harm [which] is categorically beneath the threshold of constitutional due process" conduct. *Id.*; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[T]he Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.").

But conduct falling in between those two poles—deliberate-indifference conduct which is more than negligence but less than intentional harm—presents a closer call. "[D]eliberate indifference is 'an intermediate level of culpability' that can, if proven, also establish a due process violation." *Dean*, 976 F.3d at 415 (citing *Lewis*, 523 U.S. at 848–

7

49). Ultimately, the applicable standard of culpability for a substantive-due-process claim—either "intent to harm" or "deliberate indifference"—depends on "an exact analysis of [the] context and circumstances" of the case. *Id.* at 414; *see also Lewis*, 523 U.S. at 850 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory.").

Neither party disputes that deliberate indifference is the appropriate standard of culpability here, and we agree. The deliberate-indifference standard "is sensibly employed only when actual deliberation is practical," *Dean*, 976 F.3d at 415 (quoting *Lewis*, 523 U.S. at 851), so we must consider whether officials had time to "reflect on [their] actions," *id.* (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)). We only employ this standard of culpability where the official has the "luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.* (quoting *Lewis*, 523 U.S. at 853).

Still, as the Sixth Circuit has noted, time alone may not "transform any reckless action from a tort to conscience-shocking behavior simply because the government actor had time to appreciate *any* risk of harm." *Guertin v. Michigan*, 912 F.3d 907, 924 (6th Cir. 2019) (quoting *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014)). And other factors, of course, could also be relevant to whether a defendant's conduct is conscience-shocking, such as "the type of harm" and "the level of risk of the harm occurring." *Id.* (quoting *Range*, 763 F.3d at 591).

8

Here, deliberate indifference is the correct standard to measure the Housing Authority's conduct. Unlike cases involving emergency, split-second decisions, Plaintiff alleges years of choices by the Housing Authority that led to the tragic circumstances of this case. For example, throughout Witherspoon's tenancy at Allen Benedict Court, where he lived from 2012 until his death in 2019, the Housing Authority received requests from tenants to repair conditions at the apartments—and we might infer a steady stream of serious requests, too, based on the amount of code violations discovered after Witherspoon's death. Yet the Housing Authority chose not to respond to these complaints, or at most took only half-measures to resolve them.

Additionally, the Housing Authority adopted a specific policy in 2017 to ensure that missing carbon monoxide detectors, which it considered to be "life-threatening conditions," were installed in *some* (privately owned) properties. J.A. 29. But two years later—and with time to reflect that such "life-threatening conditions" from carbon monoxide threatened *all* of its properties—the Housing Authority had chosen not to apply the same policy to its *own* housing. Thus, the facts alleged show there was ample time to deliberate and reflect on those choices. Accordingly, deliberate indifference is the correct standard to apply here.

Next, we consider whether the Housing Authority's alleged conduct constitutes deliberate indifference to Witherspoon's life and safety. To prove deliberate indifference, a plaintiff must show "that the [defendant] subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk." *Dean*, 976 F.3d at 416. "A defendant's subjective knowledge of the risk may be inferred from circumstantial

9

evidence." *Id.* A plaintiff may also show subjective knowledge in a due-process claim "from the very fact that the risk was obvious." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)); *see also Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019) ("A plaintiff may satisfy this standard by 'prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known.'" (quoting *Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015))), *as amended* (May 6, 2019).

The Housing Authority argues that Plaintiff failed to allege that the Housing Authority recognized the risk of carbon monoxide poisoning. Specifically, the Housing Authority posits that without prior knowledge of past complaints relating to carbon monoxide leaks or other similar dangerous conditions, it could not have known the danger here. Response Br. at 5 ("[Plaintiff's] Amended Complaint fails to allege or show that [the Housing Authority] had any prior knowledge of the specific carbon monoxide toxicity nor that any such incident regarding carbon monoxide resulted in any prior injury."). We disagree because our decision in *Dean ex rel. Harkness v. McKinney* dispels the Housing Authority's argument that a prior incident is necessary to show knowledge of a risk.

In *Dean*, this Court held that a reasonable jury could conclude that a police officer acted with deliberate indifference when he accidentally struck a woman with his police vehicle while speeding, causing her to sustain severe injuries. *Dean*, 976 F.3d at 412, 416. Our decision turned on the evidence of the officer's conduct on the *night* of the accident, rather than evidence of any prior driving complaints or incidents. *See id.* at 416–17. The evidence showed that, on the night of the accident, the officer "knew that he was no longer

10

responding to an emergency" and "understood that department policy and state law required that he deactivate his emergency lights and siren and follow the speed limit." *Id.* at 416. Yet with several minutes to deliberate on his actions, the officer continued to drive his vehicle more than thirty miles per hour over the speed limit "on a dark, curved road . . . without his emergency lights and siren." *Id.* This behavior, we held, was enough to be conscience shocking. *Id.* at 417.

Likewise here. Plaintiff has alleged enough facts at this early stage to establish that the Housing Authority recognized the risk of carbon monoxide poisoning and acted inappropriately in light of that risk.

To start, we note the unique nature of the risk in this case. Carbon monoxide is dangerous because "it is colorless, odorless and tasteless," hence why it is often called the "silent killer." J.A. 25. Its initial symptoms "appear like the flu," and include unremarkable symptoms like headache and fatigue. J.A. 26 n.2. Ultimately, carbon monoxide can be lethal.

These allegations inevitably raise the question of whether the risk of not installing carbon monoxide detectors is so obvious that we could infer the Housing Authority's subjective knowledge in this case. But no such inference is required here because Plaintiff has plausibly alleged that, by enacting Policy 8-1.C, the Housing Authority *expressly acknowledged* that a "[m]issing or inoperable carbon monoxide detector" or a gas heating system with improper chimney venting constitute "life-threatening conditions." J.A. 29. That allegation shows that the Housing Authority subjectively understood that these risks

11

applied not only to the residents of privately owned apartments covered by the policy, but also to the tenants of apartments like Allen Benedict Court.

Similarly, in *Castro v. County of Los Angeles*, the Ninth Circuit, sitting en banc, found substantial evidence that a county subjectively understood that its jail-cell design might lead to a constitutional violation. 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc). There, the county had adopted by reference into its housing code several provisions from the state building code, which specifically required monitoring systems in sobering cells. *Id.* at 1077. And the station manual for the county jail further mandated that sobering cells allow for visual supervision. *Id.* When a pretrial detainee was attacked in a cell missing those features, the court found the adoption of those provisions demonstrated subjective knowledge: the county's "affirmative adoption of regulations aimed at mitigating the risk of serious injury to individuals housed in sobering cells" was proof that it knew the risk of harm to the plaintiff. *Id.*

The facts, as alleged here, look no different. By affirmatively adopting regulations recognizing the life-threatening danger of missing carbon monoxide detectors, the Housing Authority demonstrated that it knew the risk of harm that Witherspoon faced.

Additionally, the Housing Authority acknowledged in Policy 8-1.C the risk of failing to maintain the venting system of a gas-burning furnace. Plaintiff alleged that, at Allen Benedict Court, the Housing Authority did not "promptly and fully investigate[] and remed[y] . . . [r]equests for repairs and maintenance, *especially as to anything related to the gas furnaces and venting.*" J.A. 28 (emphasis added). The events of January 17, 2019, demonstrate that these problems were not corrected. So the allegation that the Housing

12

Authority received complaints about the furnace, but failed to act on them, leads to an inference that the Housing Authority had subjective knowledge of a grave risk. That is, either the Housing Authority *did* investigate the complaints, in which we might infer that its employee saw the debris build-up and chose to do nothing; or it *refused* to inspect the furnace entirely, in which case it chose to be willfully blind to a serious risk of harm. That, too, plausibly alleges deliberate indifference. *See Makdessi*, 789 F.3d at 133–34 (holding that a defendant will not avoid liability if he "refused to verify 'underlying facts that he strongly suspected to be true' [or] 'declined to confirm inferences of risk that he strongly suspected to exist'" (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995))).

Taken to its logical conclusion, the Housing Authority's argument would amount to a "one free death" card. *Cf. Doe v. Fairfax Cnty. Sch. Bd.*, 10 F.4th 406, 412 (4th Cir. 2021) (Wynn, J., concurring in the denial of rehearing en banc) (rejecting the notion that schools faced with lawsuits related to sexual assaults get "one free rape"). That's because, where a landlord fails to install carbon monoxide detectors or inspect a furnace, the most likely way they will discover any dangerous emissions will be a person's very serious illness or death. As the Seventh Circuit has noted, "[t]hat no one in the past [was harmed] simply shows that [the defendant] was fortunate, not that it wasn't deliberately indifferent." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (stating that the defendant "does not get a 'one free suicide' pass"). We reject such a theory here, where the

13

Housing Authority's conduct virtually ensured it would have no knowledge of dangerous emissions from its furnaces until it was too late.[3]

Next, we find that Plaintiff has also sufficiently pleaded that the Housing Authority acted inappropriately in light of this risk. Specifically, the Housing Authority failed to install a single carbon monoxide detector at Witherspoon's 244-unit complex. It provided no preventative maintenance of appliances. Instead, through its policies and practices, the Housing Authority ensured that its property fell into a state of disrepair. Its repair request system was so inadequate and incomplete that tenants believed that "if they complained, things would not be fixed." J.A. 30. And even if tenants were to complain, the Housing Authority chose to understaff its maintenance personnel and inspectors, leaving its employees ill-equipped to provide adequate maintenance. Indeed, the Housing Authority had only a single inspector for 2,600 housing units.

All of these actions together gave rise to a potentially grave threat that could harm the hundreds of low-income families that lived at Allen Benedict Court. And it did. Ultimately, the entire complex was evacuated after two men died and several others were sent to the hospital.

---

[3] The Housing Authority passingly states at the end of its brief that Plaintiff's allegations resemble a "state-created danger" claim. Response Br. at 24. But it posits that any such claim should be disposed of based on the same argument it already raises— namely, that the Housing Authority did not have subjective knowledge of a specific risk. For the reasons already stated, we disagree that Plaintiff did not adequately plead subjective knowledge. Furthermore, we don't read the Housing Authority to be arguing whether Plaintiff's claims are actionable at all under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. at 197. To the extent it raises that issue, we find Plaintiff's allegations sufficient at this stage.

14

Critically, too, Plaintiff alleged this policy of willful neglect in the apartment's maintenance was a *conscious choice* by the Housing Authority. By engaging in a pattern of mismanagement and poor maintenance, the Housing Authority allegedly hoped to allow its properties to become "so dangerously unsafe and uninhabitable that they became eligible for federal grants," such as the HOPE VI grant. J.A. 21–22. On five different occasions, the Housing Authority applied for such federal grants in efforts "to find funds for the demolition and revitalization of the Allen Benedict Court Apartments." J.A. 23. Such blatant disregard for tenant safety in order to obtain federal funding, if proven to be true, would be conscience shocking, as it lacks any "reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 846; *see also Guertin*, 912 F.3d at 926 (holding, in the context of the Flint, Michigan, water crisis, that "jealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community").

At bottom, the facts alleged in this case shock the conscience: a public housing authority's deliberate indifference to a risk of harm that threatened numerous families living in low-income housing. What is more, two men died because of that indifference, several more were hospitalized, and an entire community was evacuated. Substantive due process exists as the "last line of defense" against such official abuses of power that are so arbitrary as to shock the conscience of the court. *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980).

These grave facts are surely even more egregious than those in *Dean*—accordingly, we find that Plaintiff's complaint sufficiently alleges that the Housing Authority acted with

15

deliberate indifference to Witherspoon's bodily integrity, thereby violating his substantive-due-process rights.

B.

We next examine whether Plaintiff has pleaded facts adequate to show that this constitutional violation is attributable to the Housing Authority. To hold a municipality responsible for a constitutional violation under *Monell*, a plaintiff must show that the municipality's policies were "the 'moving force' behind a deprivation of federal rights." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 694). This requires a plaintiff to "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). "[T]he municipality itself, through one of its policies or customs," must "cause[] the constitutional violation; municipal liability cannot be premised on *respondeat superior* or vicarious liability." *Buffington v. Baltimore County*, 913 F.2d 113, 122 (4th Cir. 1990); *see also Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), *as amended* (June 10, 2020). Accordingly, a "rigorous" causation standard "must be applied to ensure that the municipality is not held liable solely for the actions of its employee[s]." *Carter*, 164 F.3d at 218 (quoting *Brown*, 520 U.S. at 405).

Establishing causation requires a plaintiff to first identify a specific deficiency in a policy. *See Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). "[S]cattershot" allegations of "past generalized bad [municipal] behavior" causing "future generalized bad [municipal] behavior" are insufficient to establish causation. *Carter*, 164 F.3d at 218–19; *see Spell*, 824 F.2d at 1390 (requiring "a specific deficiency rather than general laxness or

16

ineffectiveness"); *see also Buffington*, 913 F.2d at 122 ("It will not 'suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989))). In other words, a plaintiff must identify a "*specific* deficiency" and establish that deficiency's causal connection to "the *specific* violation." *Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).

The Housing Authority asserts that Plaintiff fails to "adhere to the specificity require[ment]" for causation under *Monell*. Response Br. at 10. In particular, the Housing Authority claims that Plaintiff "wad[es] into collateral accusations of marginally related incidents and 'splatter-paint[s] a picture of scattered violations' in the effort to plead the requisite threshold for a specific harm to a specific individual." *Id.* at 11 (quoting *Carter*, 164 F.3d at 219).

We disagree with the Housing Authority's assessment. Although Plaintiff's complaint does contain allegations that the Housing Authority has violated state and local law and incurred hundreds of housing code violations, it also identifies specific policies that are distinct from those "scattered violations." Plaintiff's complaint alleged that the Housing Authority elected to apply Policy 8-1.C only to privately owned apartments, understaffed its inspectors and personnel, operated a non-uniform repair system, adopted a "custom of willful neglect" to obtain federal grants, J.A. 21, and failed to train and supervise its employees in complying with applicable housing laws. These are specific deficiencies in the Housing Authority's procedures, practices, and training programs,

17

which go further than allegations of "past generalized bad [municipal] behavior." *Carter*, 164 F.3d at 219.

Nonetheless, identifying a specific deficiency in a policy is not enough to impose municipal liability; a plaintiff must also establish "a sufficiently close causal link" between that deficiency and the constitutional injury. *Spell*, 824 F.2d at 1390. A plaintiff must show that the deficiency is "closely related to the injury complained of" and "that the injury would have been avoided 'under a program that was not deficient in the identified respect.'" *Gordon v. Kidd*, 971 F.2d 1087, 1097 (4th Cir. 1992) (quoting *Harris*, 489 U.S. at 391), *as amended* (July 7, 1992). In other words, a plaintiff must assess whether a correction of the deficiency would have averted the specific violation. *See Buffington*, 913 F.2d at 122–23.

This Court's decision in *Owens v. Baltimore City State's Attorneys Office* is instructive. *See Owens*, 767 F.3d at 402–04. In that case, the plaintiff alleged that the Baltimore City Police Department violated his constitutional rights by maintaining a custom of "condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *See id.* at 402. To support his claim, the plaintiff alleged that "reported and unreported cases" and "numerous 'successful motions'" evidenced the police department's custom of suppressing exculpatory evidence. *Id.* at 403. This Court held that these allegations were sufficient to survive a motion to dismiss. *Id.* at 404. In reaching this conclusion, we emphasized that a litigant must do "more" than allege "a municipality's adherence to an impermissible custom." *Id.* at 403.

18

And there, "[the plaintiff] ha[d] done more"—he "alleged facts . . . which, if true, would buttress his legal conclusion." *Id.*

Like *Owens*, Plaintiff "has done more" than allege the mere existence of an "impermissible" municipal custom. *Id.* Rather, Plaintiff has alleged "brief, but non-conclusory, allegations" containing facts "which, if true, would buttress h[er] legal conclusion." *Id.* Accepting all well-pleaded factual allegations as true, Plaintiff's complaint sufficiently alleges that the constitutional injury—Witherspoon's death by carbon monoxide poisoning resulting from a faulty furnace—"would have been avoided 'under a program that was not deficient in the identified respect[s].'" *Gordon*, 971 F.2d at 1097 (quoting *Harris*, 489 U.S. at 391).

Had the Housing Authority elected to apply Policy 8-1.C to Allen Benedict Court, a missing carbon monoxide detector and a faulty furnace would have been considered life-threatening conditions requiring immediate attention within twenty-four hours. It's plausible, then, that these particular "life-threatening conditions" would have been remedied: Witherspoon's detector would have sounded the alarm on the night of January 17, 2019, or the gas-burning furnace would have safely vented the carbon monoxide out of his apartment. In either case, Witherspoon's death "would have been" averted. *Id.* at 1097.

Similarly, if the Housing Authority had properly staffed inspectors and personnel, operated a uniform repair system, and trained and supervised its employees to comply with applicable housing laws, it is plausible that its employees would have been well-equipped to fix the maintenance issues at the apartments. In fact, Plaintiff alleged that at least one Housing Authority employee complained that he was not trained about carbon monoxide

19

detector requirements. Thus, it appears plausible that had he and other employees been appropriately trained, they would have known to install carbon monoxide detectors, as was required by state and local law. Under such a program, Witherspoon would have had the benefit of a carbon monoxide detector in his apartment, and many of the leaking, gas-burning appliances in Allen Benedict Court would have been repaired.

In sum, at this early stage, Plaintiff has alleged sufficient facts to establish that the Housing Authority's policies and customs were the moving force behind the constitutional injury.

IV.

For the foregoing reasons, we reverse the district court's dismissal of Plaintiff's complaint. We remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*